IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ANTHONY GRABOWSKI, | : | |
| | : | |
| Plaintiff, | : | 4:CV-01-650 |
| | : | (Judge McClure) |
| v. | : | |
| | : | |
| MICHAEL SEYBOLD, Individually | : | |
| and in his official capacity as a | : | |
| Township Police Officer within the | : | |
| Commonwealth of Pennsylvania; | : | |
| MILLER BROTHERS AUTO | : | |
| SALES, INC., | : | |
| Defendants. | : | |

## M E M O R A N D U M

October 7, 2003

### BACKGROUND:

On April 13, 2001, plaintiff Anthony Grabowski filed a complaint against

Michael Seybold and Miller Brothers Auto Sales, Inc. (Miller Brothers).  Plaintiff's

surviving counts are based on his right to intimate association under the First and

Fourteenth Amendments to the United States Constitution, through 42 U.S.C.

§ 1983 (Count I), his right to privacy under the Fourteenth Amendment, through 42

U.S.C. § 1983 (Count V), and violations of the Fair Credit Reporting Act (FCRA),

15 U.S.C. §§1681, et seq. (Count VII).  Now before the court are defendants'

motions for summary judgment on these three remaining counts.

Plaintiff's complaint alleges that on or about February 4, 1999, Seybold utilized his authority or apparent authority as a police officer to request a credit report on plaintiff from Miller Brothers.  Miller Brothers is a Pennsylvania corporation engaged in the business of selling automobiles and in connection therewith obtaining credit reports and investigative credit reports on prospective buyers from consumer reporting agencies, such as Experian Information Solutions, Inc.  Plaintiff further alleges that neither Seybold nor Miller Brothers had any legitimate law enforcement or other purpose to obtain plaintiff's credit report.

It is further alleged that in the summer of 1999, Seybold disclosed to Alice Hague certain financial and legal information contained in the credit report regarding Grabowski.  Allegedly, Seybold did this to disparage and discredit Grabowski and to interfere with Grabowski's reputation, relationship, and association with Hague.

The complaint originally contained seven counts.  The other claims besides the three already mentioned were: a claim for a violation of plaintiff's right of association guaranteed by Article I § 20 of the Pennsylvania Constitution (Count II); a deprivation of liberty and/or property without due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution (Count III); a deprivation of plaintiff's liberty, reputation, and/or property interest as guaranteed by Article I §§ 1 and 26 of the Pennsylvania Constitution (Count IV);

2

and a deprivation of plaintiff's right to privacy as guaranteed by the Pennsylvania Constitution (no Article or Amendment being specified) (Count VI).

Miller Brothers filed an answer along with affirmative defenses, and a cross-claim against Seybold, who answered the cross-claim.

Seybold filed a motion to dismiss.  The court partially granted that motion and dismissed Counts II, III, IV, and VI as to Seybold.  Those counts were subsequently dismissed by stipulation as to Miller Brothers as well.

Seybold then filed an answer to plaintiff's complaint, with affirmative defenses.

Now before the court are both defendants' motions for summary judgment, properly filed under Federal Rule of Civil Procedure 56(c).  For the reasons that follow, defendants' motions for summary judgment will be granted.


## DISCUSSION:

### I. Standard of Review

Summary judgment is appropriate if there are no genuine issues of material fact in dispute and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Beers-Capitol v.

3

Whetzel, 256 F.3d 120, 130 n.6 (3d Cir. 2001).

Initially, the moving party bears the burden of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. "It can discharge that burden by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once the moving party points to evidence demonstrating that no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable fact-finder could rule in its favor. Ridgewood Bd. of Educ. v. N.E. *ex rel.* M.E., 172 F.3d 238, 252 (3d Cir. 1999) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). Although "[s]peculation and conclusory allegations do not satisfy this duty," Ridgewood, 172 F.3d at 252 (citing Groman v. Township of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995)), all inferences are made in a light most favorable to the nonmoving party. Saucier v. Katz, 533 U.S. 194, 201 (2001); Carter v. Exxon Co. USA, 177 F.3d 197, 202 (3d Cir. 2000).

4

## II. Statement of Relevant Facts

We now recount the relevant, material facts of this case.  To the extent that the parties disagree about some of the factual details, we recite the facts in this review of defendants' motions for summary judgment in the light most favorable to plaintiff.

Plaintiff and Alice Hague met sometime in 1997, after which they began to date in the fall of 1998.  By 1999, the two were in a serious dating relationship, and they frequently went places and talked together.

For some reason, Seybold, a local police officer, did not approve of plaintiff's and Hague's dating.  To this end, he went to Miller Brothers on February 4, 1999 to obtain a copy of plaintiff's credit report.  While wearing his police uniform, Seybold requested and obtained the credit report from Sally Garrison, an employee of Miller Brothers.  Although this was apparently the first time that Garrison had ever retrieved a credit report, she did so because she wished to comply with a police officer's request, and she had access to her employer's computer.  The retrieval of the credit report was confirmed by a representative from CBC Companies, an affiliate of Experian.  Evidently, the credit report generated on February 4, 1999 cannot be reproduced exactly by Experian, nor can any of the defendants furnish the exact copy, which they have since lost or

5

destroyed.

Plaintiff requested his own credit report on or about April 29, 1999.  This report revealed the request placed by Miller Brothers for plaintiff's credit report on February 4, 1999.

Sometime in the summer of 1999, Seybold allegedly disclosed the information in plaintiff's credit report to Hague, along with some other personal information about plaintiff not contained in the credit report.  This disclosure disrupted plaintiff's relationship with Hague.  They stopped dating for a while, but ultimately rekindled their relationship, which is now much closer than it ever has been before.

### III. Plaintiff's Claims Under the FCRA Are Time-Barred

The FCRA was enacted "to promote efficiency in the Nation's banking system and to protect consumer privacy."  TRW, Inc. v. Andrews, 534 U.S. 19, 23 (2001).  The FCRA aims to ensure the proper creation, maintenance, furnishing, and use of individuals' credit reports by, *inter alia*, providing private rights of action for consumers harmed by negligent and willful noncompliance with the FCRA.  See, e.g., 15 U.S.C. § 1681n-o; TRW, 534 U.S. at 23.  Plaintiff alleges in his complaint that defendants both willfully and negligently failed to comply with the FCRA.

These claims are time-barred.  An action for willful noncompliance with the FCRA, 15 U.S.C. § 1681n, or negligent noncompliance, 15 U.S.C. § 1681o, must comply with the Act's own statute of limitations, appearing in § 1681p.  Section 1681p provides, in pertinent part:

> An action to enforce any liability created under this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within two years from the date on which the liability arises, except that where a defendant has materially and willfully misrepresented any information required under this subchapter to be disclosed to an individual and the information so misrepresented is material to the establishment of the defendant's liability to that individual under this subchapter, the action may be brought at any time within two years after discovery by the individual of the misrepresentation.

15 U.S.C. § 1681p.  Thus, any action under the FCRA must be brought within two years of the date on which liability arises.  Here, plaintiff alleges that his credit report was improperly furnished on February 4, 1999, more than two years before plaintiff commenced his action by filing a complaint on April 13, 2001.

The limitations period begins to run from the date of the violation of the FCRA, whether defendants' alleged noncompliance with the FCRA was negligent or willful.  See Houghton v. Ins. Crime Prevention Inst., 795 F.2d 322, 322-23 (3d Cir. 1986).  In Houghton, the Third Circuit addressed a plaintiff's allegations that certain defendants willfully and negligently used fraudulent information to obtain the

7

plaintiff's credit report.  The Third Circuit used the date on which the action

complained of took place to determine that the plaintiff's claims, both of willful and

negligent noncompliance, were time-barred.  See id.  Although the Supreme Court

did not address this issue in its recent examination of the FCRA in TRW, it did,

however, seemingly approve of the Ninth Circuit's finding that "liability arises" at

the time when the FCRA violation occurs, whether the noncompliance is negligent

or willful.  See TRW, 534 U.S. at 34-35.

Plaintiff therefore appears to be barred by § 1681p from bringing his FCRA

claim.  Plaintiff, however, claims that the narrow tolling exception in § 1681p

applies in his case.  The exception tolls the period within which an individual must

bring an action until that time when an individual learned that another has "materially

and willfully misrepresented any information required under this subchapter to be

disclosed" to the individual.  15 U.S.C. § 1681p.

Plaintiff must rely on this narrow exception because the Supreme Court has

stated that the traditional discovery rule cannot be used to toll the FCRA's statute

of limitations.  TRW, 534 U.S. at 23; accord Houghton, 795 F.2d at 325.

Unfortunately for plaintiff, the tolling provision of § 1681p does not apply

for two reasons.  The first reason is that defendants did not make any

misrepresentations to plaintiff.  The second reason is that defendants were not

required under the FCRA to disclose any information to plaintiff.

Under § 1681p, defendants must have "materially and willfully misrepresented any information" required to be disclosed to plaintiff.  There are no facts whatsoever which suggest that defendants willfully misrepresented any information that should have been disclosed to plaintiff.  For instance, Plaintiff points to no facts which demonstrate that Seybold materially misrepresented anything to plaintiff.  Seybold might have used fraud or chicanery, such as wearing his police uniform, to obtain a copy of plaintiff's credit report for personal reasons.  Seybold never actively concealed his actions from plaintiff.

Likewise, Miller Brothers never actively concealed the fact that its employee, Garrison, obtained plaintiff's credit report.  The credit report generated by Garrison's request openly appears on all of plaintiff's subsequent credit reports. (See Def. Miller Bros. App. Exs., Rec. Doc. No. 50, Ex. "F" at 9.)  No facts suggest that Miller Brothers ever told plaintiff that Garrison had *not* obtained a credit report on plaintiff, either.  Absent any misrepresentation on defendants' parts, the tolling provision of §1681p is unavailable to plaintiff.

The second reason that the tolling provision of § 1681p does not apply is because defendants were under no obligation to make any disclosures to plaintiff. To satisfy the narrow tolling provision of § 1681p, plaintiff must point to a specific

violation of an FCRA disclosure requirement by defendants.  Plaintiff must do so because defendants were under no general duty to disclose to plaintiff that a credit report was obtained on him.  See, e.g., 15 U.S.C. §1681b(2) (requiring disclosure only when report requested relates to employment); 15 U.S.C. § 1681m (requiring disclosure only when user takes "adverse action" against consumer in certain transactions).

To this end, plaintiff points to § 1681d, which requires that it be disclosed to an individual within three days of a request for an "investigative consumer report" that such a report was requested and furnished.  (See Pl.'s Br. in Opp'n to Def. Miller Bros.' Mot. Summ. J., Rec. Doc. No. 56, at 4.)  Specifically, § 1681d(a) requires that:

> A person may not procure or cause to be prepared an investigative consumer report on any consumer unless–
>> (1) it is clearly and accurately *disclosed to the consumer* that an investigative consumer report including information as to his character, general reputation, personal characteristics, and mode of living, whichever are applicable, may be made, and such disclosure
>>> (A) is made in a writing mailed, *or otherwise delivered, to the consumer, not later than three days after the date on which the report was first requested*, and
>>> (B) includes a statement informing the consumer of his right to request the additional disclosures provided for under subsection (b) of this section and the written summary of the rights of the consumer prepared pursuant to section 1681g(c) of this title; and

10

(2) the person certifies or has certified to the consumer
reporting agency that–
> (A) the person has made the disclosures to the consumer
> required by paragraph (1); and
> (B) the person will comply with subsection (b) of this
> section.

18 U.S.C. § 1681d(a) (emphasis added).  Plaintiff's allegation therefore rests on

defendants' failure to notify plaintiff that an "investigative consumer report" on him

was compiled, as required by §§ 1681d(a)(1)-(2).

The parties do not dispute that plaintiff did not receive notice that an

investigative consumer report on him was prepared, as required by § 1681d(a)(1).

As no notice was ever sent to plaintiff, no compliance certification was ever sent to

Experian under § 1681d(a)(2), either.

So, even assuming *arguendo* that plaintiff could show some

misrepresentation on defendants' parts, as discussed above, plaintiff must further

show that the report procured was, in fact, an "investigative consumer report"

within the meaning of the FCRA.  A normal consumer report is:

> any written, oral, or other communication of any information by a
> consumer reporting agency bearing on a consumer's credit worthiness,
> credit standing, credit capacity, character, general reputation, personal
> characteristics, or mode of living which is used or expected to be used
> or collected in whole or in part for the purpose of serving as a factor
> in establishing the consumer's eligibility for–
> > (A) credit or insurance to be used primarily for personal,
> > family, or household purposes;

11

(B) employment purposes; or
(C) any other purpose authorized under section 1681b of this
title.

15 U.S.C. § 1681a(d)(1).  An "investigative consumer report" is basically an

enhanced consumer report, in that it is:

> *a consumer report or portion thereof in which information on a*
> *consumer's character, general reputation, personal characteristics, or*
> *mode of living is obtained through personal interviews* with neighbors,
> friends, or associates of the consumer reported on or with others with
> whom he is acquainted or who may have knowledge concerning any such
> items of information. However, such information shall not include
> specific factual information on a consumer's credit record obtained
> directly from a creditor of the consumer or from a consumer reporting
> agency when such information was obtained directly from a creditor of
> the consumer or from the consumer.

18 U.S.C. § 1681a(e) (emphasis added).  So, for the report in question to qualify as

an "investigative consumer report," the report must contain information on

plaintiff's "character, general reputation, personal characteristics, or mode of living

[which was] obtained through personal interviews."  18 U.S.C. § 1681(e).  If it

does, then defendants clearly failed to inform plaintiff of the report's existence

under § 1681d(1), which would trigger the tolling exception of § 1681p, thereby

making plaintiff's claim timely.

To prove that the report at issue was an investigative consumer report,

plaintiff relies on a terse boilerplate statement appearing on a more recent credit

12

report produced by Experian.  The statement reads that information appearing on the report may have been gathered from "you, your creditors, and other sources." (See Rec. Doc. No. 50, Ex. "F" at 10.)  Plaintiff claims that defendants cannot "negate the possibility that the 'other sources' were personal interviews," which would bring the report inside the definition of an "investigative consumer report" under § 1681a(e).  (See Rec. Doc. 56, at 5.)  Plaintiff further claims that defendants cannot negate the possibility that personal interviews were conducted because defendants and Experian cannot produce the exact report originally furnished to Seybold.  (Id.)

Plaintiff's argument is unavailing.  First plaintiff uses a more recent version of plaintiff's credit report to show that "other sources" may have been used to create the report at issue.  Then, plaintiff asserts that because the report at issue is unavailable, defendants cannot disprove that personal interviews were used in it. Plaintiff, though, cannot use more recent credit reports to show that "other sources" might have been used in the report at issue, and simultaneously discount those same recent credits reports as not being identical to the report at issue.

There is no genuine issue of material fact regarding whether the credit report at issue differed in any way from the subsequent versions used by all the parties to serve as examples of Experian credit reports.  Even a cursory review of a recent

13

Experian credit report on plaintiff reveals that it contains no information of

plaintiff's "character, general reputation, personal characteristics, or mode of

living." (See Rec. Doc. No. 56, Ex. "F".)  The report merely contains financial and

legal information.  Moreover, the testimony of a Bureau Manager for CBC Credit

Reporting Company (an affiliate of Experian), makes clear that there is no reason

why the credit report provided in 1999 would be any different from subsequent

credit reports on plaintiff.  (See Def. Seybold's App., Rec. Doc. No. 46, Ex. "D"

at 16, 93-95.)

Other facts also suggest that no reasonable jury could find that the report at

issue was an investigative consumer report.  The report at issue was obtained

almost instantaneously by Garrison via the Internet, which undercuts the possibility

that any personal interviews were incorporated in the report.  The record is also

devoid of any notice sent by defendants or Garrison to Experian which certifies

that they had notified plaintiff that an investigative consumer report on him was

requested.  See 15 U.S.C. § 1681d(a)(2)(A).  Experian could not issue an

investigative consumer report without the proper notification.  Id.  Lastly, and most

tellingly, "Experian does not provide investigative consumer reports."  See

Experian, *All About Credit*, *Glossary*, http://www.experian.com/consumer/

help/glossary/d-k.html (last visited Oct. 2, 2003).  It is extremely unlikely, and

unreasonable to assume otherwise, that Experian would break with its standard practice and provide an investigative consumer report on plaintiff and plaintiff alone.

Accordingly, no reasonable jury could conclude that defendants obtained an "investigative consumer report" on plaintiff.  Consequently, defendants could not violate § 1681d.  Without violating § 1681d, there is no action on defendants' parts that would trigger the tolling exception in § 1681p.  Therefore, the two-year statute of limitations of § 1681p applies, meaning that plaintiff's claims of noncompliance with the FCRA, §§ 1681n-o, are barred because he failed to bring his claim within the applicable two-year period.

## IV. Plaintiff's Claim Under the Right to Freedom of Association

Plaintiff alleges that his right to intimate association was interfered with by Miller Brothers's permitting a credit report to be generated, and by Seybold's conveyance of the report's information to Hague.  Plaintiff uses 42 U.S.C. § 1983 to bring his claim.  Section 1983 affords plaintiffs a cause of action against persons "who, under color of any statute  … of any State … subject[] … any citizen … to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983; see also Wyatt v. Cole, 504 U.S. 158, 161 (1992).  "To state a

claim under § 1983, a plaintiff must show that the defendant, through conduct sanctioned under the color of state law, deprived her of a federal constitutional or statutory right."  <u>Gruenke v. Seip</u>, 225 F.3d 290, 298 (3d Cir. 2000).  Although Seybold seems to concede that he was a state actor, Miller Brothers was not a state actor for purposes of § 1983.

## A. Miller Brothers is Not a State Actor

Regardless of the precise source and scope of plaintiff's right to freedom of association, he must preliminarily show that defendants violated his right while acting "under color of state law."  42 U.S.C. § 1983.  Miller Brothers is not a state actor for purposes of 42 U.S.C. § 1983.  Miller Brothers is a privately owned and operated corporation, and not an instrumentality of the state.  Nonetheless, plaintiff asserts that Miller Brothers was a "joint actor" acting under the color of state law because it vicariously aided Seybold, an apparent state actor, in wrongfully obtaining a credit report through its employee, Garrison.  This, plaintiff argues, makes Miller Brothers a "willful participant in joint activity with the State or its agents."  <u>Crissman v. Dover Downs Entm't</u>, 289 F.3d 231, 242 (3d Cir. 2002).

The Third Circuit recently surveyed the tests used by courts to determine whether a defendant's actions "can be fairly attributed to the state" in <u>Crissman</u>, 289 F.3d at 239.  The overarching question is whether "'it can be said that the State

is *responsible* for the specific conduct of which the plaintiff complains.'"

Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295

(2001) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982) (emphasis original)).

     The only evidence plaintiff proffers to show that Miller Brothers was a joint

actor with the State is Garrison's testimony.  Garrison testified that she obtained

plaintiff's credit report because she knew Seybold was a township police officer

and he entered the dealership while wearing his police uniform.  This testimony is

insufficient to paint Miller Brothers as a joint actor.  No evidence shows that

Garrison acted jointly or in conspiracy with Seybold to obtain plaintiff's credit

report.  A reasonable reading of the undisputed facts shows that Garrison only

obtained plaintiff's credit report at a police officer's behest.  She reasonably feared

disobeying an officer's request.  (See Rec. Doc. No. 50, Ex. "I" at 11-14.)  No

facts prove, or even hint, that Garrison willfully desired to interfere with plaintiff's

relationship with Hague, or even knew who the two of them were.  Even if she did,

*respondeat superior* typically may not serve as a basis of liability under § 1983.

See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); see also Sutton v.

Rasheed, 323 F.3d 236, 249 (3d Cir. 2003) (stating that defendant must have

personal involvement to be liable in § 1983 action).

     Ample record evidence further demonstrates that Miller Brothers is not a

17

joint actor with the State.  Miller Brothers is neither controlled nor managed by an

agency of the State.  <u>See</u> <u>Evans v. Newton</u>, 382 U.S. 296, 299, 301 (1966);

<u>Pennsylvania v. Bd. of Directors of City Trusts of Phila.</u>, 353 U.S. 230, 231

(1957).  It is not delegated any public function.  <u>See</u> <u>West v. Atkins</u>, 487 U.S. 42,

56 (1988).  There is not even any purported regulation by, or flow of funds from,

the State to Miller Brothers.  <u>See</u> <u>Crissman</u>, 289 F.3d at 244.  Thus, Miller Brothers

is not a joint actor with the State, as there is no "symbiotic relationship," "close

nexus," or "involvement and interdependence," between Miller Brothers and the

State.  <u>See</u> <u>Crissman</u>, 289 F.3d at 240, 243, 245-46 (summarizing state actor

jurisprudence).  Plaintiff therefore cannot sustain his § 1983 claim against Miller

Brothers because plaintiff fails to satisfy the "under color of state law" requirement

of § 1983.

### B. Seybold Enjoys Qualified Immunity

Seybold does not dispute that he was acting under color of state law when

he requested plaintiff's credit report.  Seybold does, however, contend that he

enjoys qualified immunity.

The Third Circuit has set forth the procedure for determining if qualified

immunity applies:

Qualified immunity generally protects government officials performing

discretionary functions from civil damages.  Harlow v. Fitzgerald, 457
U.S. 800, 818 [] (1982).  Qualified immunity applies so long as the
officials' "conduct [did] not violate clearly established statutory or
constitutional rights of which a reasonable person would have known."
Id. In determining whether qualified immunity applies, we ask: (1) whether
the plaintiff has alleged the deprivation of an actual constitutional right,
and if so, (2) whether the right was clearly established at the time of the
alleged violation. Saucier v. Katz, 533 U.S. 194, 200 [] (2001); Eddy v.
Virgin Islands Water and Power Authority, 256 F.3d 204, 208 (3d Cir.
2001). A right is clearly established if "its outlines are sufficiently clear
that a reasonable officer would understand that his actions violate the
right." Sterling v. Borough of Minersville, 232 F.3d 190, 193 (3d Cir.
2000). Therefore, our task is "'to determine first whether the plaintiff has
alleged a deprivation of a constitutional right at all,' before reaching the
question of whether the right was clearly established at the time."
Johnson v. Newburgh Enlarged School District, 239 F.3d 246, 251 (2d
Cir. 2001) (quoting Lewis, 523 U.S. at 841 n. 5 []); see also Nicholas v.
Pennsylvania State University, 227 F.3d 133, 139-40 (3d Cir. 2000) . . . .

United Artists Theatre Circuit, Inc. v. Township of Washington, PA, 316 F.3d 392,

398-99 (3d Cir. 2003).

Thus, the threshold question is whether plaintiff asserts a deprivation of a

constitutional right to intimate association.  The question then becomes whether that

right was clearly established at the time of the alleged deprivation.  Id.

## 1. There is a Constitutional Right to Intimate Association

"Two types of association are protected by the federal Constitution: intimate

association (i.e., certain close and intimate human relationships like family

relationships) and expressive association (i.e., association for the purpose of

engaging in activities protected by the First Amendment." Pi Lambda Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 438 (3d Cir. 2000) (citing Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984).

Plaintiff's freedom of association claim cannot be characterized as expressive association. Expressive association requires the court to look at whether the group (here, plaintiff and Hague) engaged in expressive association, whether the state action significantly affected the group's ability to advocate viewpoints, and to weigh the state interest. See Pi Lambda Phi, 229 F.3d at 442. No evidence shows, nor does plaintiff even suggest, that he and Hague were engaging in any First Amendment expressive activity (such as political, social, cultural, economic, or religious affairs, see id.). Therefore, there is no need to analyze this type of freedom of association.

Plaintiff argues instead that he enjoys the right to intimate association, i.e., the "individual's right to enter into and maintain intimate or private relationships free of state intrusion." Pi Lambda Phi, 229 F.3d at 441. Some courts suggest that the right to intimate association flows from a Fourteenth Amendment concept of substantive due process. See Flaskamp v. Dearborn Public Schs., 232 F. Supp. 2d 730, 740 (E.D. Mich. 2002) (citing IDK, Inc. v. Clark County, 836 F.2d 1185, 1193 (9th Cir. 1988). Third Circuit law, however, suggests that the right flows

20

from the First Amendment, as incorporated by the Fourteenth Amendment.  See Via v. Taylor, 224 F. Supp. 2d 753, 760 (D. Del. 2002) ("In discussing 'freedom of association' under the First Amendment, the United States Supreme Court has created two lines of decisions."); Behm v. Luzerne County Children & Youth Policy Makers, 172 F. Supp. 2d 575, 585 (M.D. Pa. 2001) ("First Amendment freedom of association includes the right to intimate association."); see also Pi Lambda Phi, 229 F.3d at 441-42.  Thus, Third Circuit law distinguishes First Amendment intimate association from the associational right emanating from the Fourteenth Amendment's Due Process Clause right to make personal decisions "relating to marriage, procreation, contraception, family relationships, child rearing and education."  Via, 224 F. Supp. 2d at 761 (citing Planned Parenthood v. Casey, 505 U.S. 833, 851 (1992); Zablocki v. Redhail, 434 U.S. 374, 384-85 (1978)).

The United States Supreme Court itself has stated that:

> Our cases recognize a substantive due process right "to enter into and carry on certain intimate or private relationships." Rotary Club, 481 U.S., at 545 []. *As with the First Amendment right to associate*, the State may not interfere with the selection of individuals in such relationships. Jaycees, 468 U.S., at 618 []. *Though the precise scope of the right to intimate association is unclear*, "we consider factors such as size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship" to determine whether a group is sufficiently personal to warrant this type of constitutional protection.

Boy Scouts of Am. v. Dale, 530 U.S. 640, 698 n.26 (2000) (emphasis added).

Thus, regardless of the precise source of the right to intimate association, factors to consider whether a relationship is "intimate" are "'size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent.'" Pi Lambda Phi, 229 F.3d at 442 (quoting Roberts, 468 U.S. at 620). The smaller and more personal the association, the higher the relationship falls on the spectrum of protected intimate association. See Via, 224 F. Supp. 2d at 760.

There is substantial support for the conclusion that a non-marital, non-familial relationship is insufficiently intimate to qualify for First Amendment intimate association protection. See Rode, 845 F.2d at 1205 (finding that woman's relationship with brother-in-law is not intimate association); see also Marcum v. McWhorter, 308 F.3d 635, 638-39 (6th Cir. 2002) (ruling that adulterous relationship between sheriff cohabitating with married woman was not intimate); Adler v. Pataki, 185 F.3d 35, 44 (2d Cir. 1999) (recognizing First Amendment right to intimate association for married people); Cameron v. Seitz, 38 F.3d 264, 275 (6th Cir. 1994) (finding that engaged people do not enjoy right to intimate association); Flaskamp, 232 F. Supp. 2d at 741 (deciding that teacher-student relationship, even if sexual, is not constitutionally protected). Indeed, only one pre-Roberts decision has found a non-familial, dating relationship to be constitutionally protected, Wilson v. Taylor, 733 F.2d 1539 (11th Cir. 1984), and that case is

"widely recognized as overruled." Flaskamp, 232 F. Supp. 2d at 740 (collecting cases).

Nonetheless, other cases, largely in the public employment context, suggest that non-marital relationships may qualify for intimate association protection to the extent that a public employee cannot be terminated because of his relationship. See Via, 224 F. Supp. 2d at 760 (finding that off-duty, personal relationship between correctional officer and former paroled inmate qualified for protection under the right of intimate association). Doubt is further cast on the right to intimate association indirectly by the Supreme Court's recent decision in Lawrence v. Texas, -- U.S. -- , 123 S. Ct. 2472, 2484 (2003), which overruled Bowers v. Hardwick, 478 U.S. 186 (1986). The Supreme Court in Lawrence held that the Due Process Clause of the Fifth and Fourteenth Amendments afford homosexuals the liberty right to engage in consensual sexual activity at home without government intrusion. 123 S. Ct. at 2484. Although Lawrence deals with pure Fifth and Fourteenth Amendment rights to engage in sexual relations, while the instant case focuses on a derivative First Amendment right to intimate association, Lawrence still could be read as enlarging protection afforded to non-marital relationships, even those alleged as intimate under the First Amendment. Of course, the law at the time plaintiff alleged an infringement of his right to intimate association was

23

before either <u>Lawrence</u>, or even <u>Via</u>.

## 2. The Right of Intimate Association Was Not Clearly Established at the Time Plaintiff Alleges a Deprivation of His Right

The former discussion demonstrates that the First Amendment right to intimate association was far from being clearly established at the time of the alleged deprivation, as required by § 1983.  <u>See</u> <u>United Artists</u>, 316 F.3d at 398-99. Plaintiff, though, still asserts that the *use* of the credit report interfered with his supposedly intimate relationship with Hague.  Seybold, however, correctly notes that his motivation to obtain the credit report, and his knowledge that doing so violated the FCRA, does not impact the qualified immunity analysis.  The propriety of *obtaining* the credit report in the first place does not implicate plaintiff's right to intimate association *vel non*, nor does it revolve around an alleged violation of the FCRA.

Therefore, given that, at the time of Seybold's interference with plaintiff's relationship, the law on the First Amendment right to intimate association was (and continues to be) very unrefined, Seybold could not have reasonably known that his actions infringed on any established right.  He is therefore entitled to qualified immunity.  <u>See</u> <u>Behm</u>, 172 F. Supp. 2d at 586-87 (finding that county workers were entitled to qualified immunity because, notwithstanding <u>Roberts</u> in 1984, "it does

not appear that any courts, in the Third Circuit or elsewhere, have found a violation of family members' right to intimate association under the First Amendment outside of the context of employment retaliation and wrongful death cases.").

## V. Plaintiff's Privacy Claim

Defendants' final attack on plaintiff's complaint is that the FCRA comprehensively deals with disclosure of credit information and preclude a § 1983 claim based on invasion of privacy.

Defendants concede that there is a privacy interest implicated in the disclosure of certain financial information.  See, e.g., Fraternal Order of Police v. City of Philadelphia, 812 F.2d 105 (3d Cir. 1987).  We note, though, that the propriety of this § 1983 claim need only be analyzed with respect to Seybold because, as discussed above in Part IV.A, Miller Brothers was not acting under color of state law.

Defendants correctly claim that a statute may implicitly preclude a § 1983 action by creating a comprehensive remedial scheme.  See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 20-21 (1981); Pfeiffer v. Marion Ctr. Area Sch. District, 917 F.2d 779, 789 (3d Cir. 1990); see also Smith v. Robinson, 468 U.S. 992, 1011 (1984) (holding that § 1983 actions were impliedly

precluded under the Education of the Handicapped Act).

The Third Circuit recently held that the federal Telecommunications Act of 1996 (TCA), was just such a statute.  See Nextel Partners Inc. v. Kingston Township., 286 F.3d 687 (3d Cir. 2002).  The Nextel court stated that:

> A key distinction between schemes that are sufficiently comprehensive to preclude a § 1983 claim and those that are not is the availability of private judicial remedies under the statute giving rise to the claim. "In both Sea Clammers and Smith v. Robinson, the statutes at issue themselves provided for private judicial remedies, thereby evidencing congressional intent to supplant the § 1983 remedy." Wright, 479 U.S. at 427 []. In Wright, by contrast, the Court found "nothing of that kind" in the housing statute at issue, and the Court ultimately concluded that § 1983 remedies were not precluded. Id. Similarly in Blessing, the Court reasoned that § 1983 remedies might be available under the statute at issue because "[u]nlike the federal programs at issue in [Sea Clammers and Smith, this statute] contains no private remedy--either judicial or administrative--through which aggrieved persons can seek redress." Blessing, 520 U.S. at 348 [] (analyzing Title IV-D of the Social Security Act, 42 U.S.C. § 651 et seq.).

286 F.3d at 694.  Like the TCA, the FCRA contains numerous provisions that both illustrate the FCRA's strong purpose to protect consumer privacy and provide private and administrative remedies to guard that privacy.  See TRW, 534 U.S. at 23; In re Grand Jury Subpoena to Credit Bureau of Greater Harrisburg, 594 F. Supp. 229, 233 (M.D. Pa. 1984).  Indeed, the FCRA does primarily aim to regulate consumer reporting agencies, but the underlying purpose of the FCRA is still to "respect [] the consumer's right to privacy," see § 1681(a)(4).  Even a brief

26

summary of the FCRA's provisions reveal that the statute's overarching goal is to

guard consumer privacy:

- § 1681b, listing the exclusive permissible purposes for the dissemination of consumer reports

- § 1681c, limiting information that can be included on a credit report

- § 1681d, requiring consent for investigative credit reports

- § 1681e, listing compliance procedures for credit reporting agencies

- § 1681g-1681h, addressing disclosure to the consumer

- § 1681i, governing procedures to dispute accuracy of credit report

- § 1681m, addressing restrictions on users of credit reports

The FCRA also contains its own private and administrative enforcement scheme:

- § 1681n, providing civil remedies, and statutory penalties, for willful noncompliance

- § 1681o, providing civil remedies for negligent noncompliance

- § 1681q, providing criminal penalties for obtaining information under false pretense

- § 1681r, discussing unauthorized disclosure by officers and employees

- § 1681s, detailing administrative enforcement of statutory requirements

- § 1681s-2, explaining the responsibilities of furnishers of information to provide accurate information to consumer reporting agencies

27

- § 1681u, addressing disclosures to the FBI for counterintelligence purposes

Thus, like the TCA, the FCRA contains private remedies that allow an individual to sue for willful and negligent noncompliance with the FCRA, §§ 1681n-o.  It also provides for administrative enforcement, § 1681s, and criminal liability, § 1681q.  This is in stark contrast to other statutes that lack comprehensive remedial schemes which preclude § 1983 actions.  See Blessing v. Freestone, 520 U.S. 329 (1997) (remedial scheme of Title IV-D of Social Security Act was not sufficiently comprehensive to preclude remedy of suits under § 1983; Title IV-D contained no private remedy, either judicial or administrative, through which aggrieved persons could seek redress).

Also, like the TCA, the FCRA contains its own limitations period, § 1681p.  The Nextel court found the presence of a short limitations period important (30 days for the TCA), because otherwise, a plaintiff suing under the TCA "would instead presumably have four years to commence the action."  286 F.3d at 695 (citing 28 U.S.C. § 1658, which provides that "[e]xcept as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.").  Although the FCRA's statute of limitations of two years is

longer than the TCA's, it is half as short as the federal default period of four years.
<u>See</u> 28 U.S.C. § 1658(a).

The FCRA also resembles the Resource Conservation and Recovery Act
(RCRA), which other courts have held to be sufficiently comprehensive as to
preclude a § 1983 action.  <u>See</u> <u>Leland v. Moran</u>, 235 F. Supp. 2d 153, 171-72
(S.D.N.Y. 2002); <u>see also</u> <u>Garcia v. Cecos Int'l, Inc.</u>, 761 F.2d 76, 82-83 (1st Cir.
1985).  The <u>Leland</u> court quoted the Supreme Court, which stated that "'where a
statute expressly provides a particular remedy or remedies, a court must be chary
of reading others into it.'" <u>Leland</u>, 235 F. Supp. 2d at 171 (quoting <u>Sea Clammers</u>,
453 U.S. at 14-15).  The RCRA, like the FCRA, "contains numerous explicit
remedies, including civil and criminal penalties that may be enforced by the federal
government, 42 U.S.C. § 6928, administrative enforcement actions, 42 U.S.C. §
6961(b), and a private cause of action, 42 U.S.C. § 6972." <u>Id.</u> at 171-72.

Thus, although mindful that Congressional intent to preclude implicitly
§ 1983 claims must not be taken lightly, <u>see</u> <u>Suter v. Artist M.</u>, 503 U.S. 347
(1992), the FCRA's remedial scheme is comprehensive enough to preclude a
§ 1983 action based on an alleged invasion of privacy.  Like the <u>Nextel</u> court, we
do not "mean that the [FCRA] in any way modified, impaired, or superceded
§ 1983 . . . we simply hold that the [FCRA] itself did not create a right that can be

29

asserted under § 1983 in lieu of the [FCRA's] own remedial scheme" to safeguard an individual's privacy.  Nextel, 286 F.3d at 696.

We therefore find that plaintiff cannot assert a deprivation of a right to privacy via § 1983 because the FCRA's own comprehensive remedial scheme precludes such an action.

## VI. Conclusion

Defendants' motions for summary judgment as to plaintiff's claims for willful and negligent noncompliance with the FCRA (Count VII), will be granted because plaintiff's claims are time-barred under the FCRA's two-year statute of limitations.

Seybold's motion for summary judgment as to plaintiff's freedom of association claim (Count I) will be granted because Seybold enjoys qualified immunity.  Miller Brothers' motion for summary judgment as to this claim will also be granted because Miller Brothers was not a state actor, nor a joint actor with the state, as required for a § 1983 action.

Defendants' motions for summary judgment as to plaintiff's claim for invasion of privacy (Count V), will be granted because the FCRA's comprehensive remedial scheme precludes a § 1983 action to enforce a generic privacy right.

Because none of plaintiff's claims against defendants remains, Miller

30

Brothers's cross-claim against Seybold will be dismissed.

An appropriate order will issue.

                                          s/ James F. McClure, Jr.
                                          James F. McClure, Jr.
                                          United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANTHONY GRABOWSKI,                :
                                  :
              Plaintiff,          :          4:CV-01-650
                                  :          (Judge McClure)
       v.                         :
                                  :
MICHAEL SEYBOLD, Individually     :
and in his official capacity as a :
Township Police Officer within the:
Commonwealth of Pennsylvania;     :
MILLER BROTHERS AUTO              :
SALES, INC.,                      :
              Defendants.         :

## O R D E R

October 7, 2003

For the reasons set forth in the accompanying memorandum,

**IT IS ORDERED THAT:**

1. Defendants' motions for summary judgment as to plaintiff's counts I, V, and VII are granted.

2. Miller Brothers's cross-claim against Seybold is dismissed.

3. Summary judgment is granted in favor of both defendants and against plaintiff on all remaining counts, namely Counts I, V, and VII.

4. The clerk is directed to close the case file.


    s/ James F. McClure, Jr.
James F. McClure, Jr.
United States District Judge